IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

YULANDA HILL                                                    PLAINTIFF

v.                              Case No. 5:12-cv-016 JLH

CAROLYN WALKER, *et al.*                                        DEFENDANTS


## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

For their Brief in Support, defendants Carolyn Walker and the

Arkansas Department of Human Services set forth the following:


## I.  INTRODUCTION

Plaintiff Yulunda Hill was a Family Service Worker (i.e., caseworker)

for the Arkansas Department of Human Services, Division of Child and

Family Services.  In May of 2011, Hill sent an email to her supervisor and

various other ADHS officials (including the Director of ADHS) notifying them

that she was removing herself from a case because the family was too

problematic; e.g., subjecting her to verbal abuse, threatening that they were

taping their communications with her, and contacting the Governor's Office

to complain about her.  Hill then met with her immediate supervisor, the

County Supervisor (defendant Carolyn Walker), and the Area Director,

during which meeting Hill told them the case was causing her stress, anxiety,

1

and panic attacks.  The ADHS officials told Hill she could not remove herself from a case, but offered several suggestions for assisting her with handling the case.  This meeting caused Hill to have a panic attack, and she left work for the rest of the day.

The following day, Hill brought in a doctor's note indicating only that she had an "illness" and releasing her from work for over three weeks.  Hill's supervisor originally approved her request for time off, which Hill planned to cover with earned compensatory time.  Upon a reevaluation of the office's workload, Walker notified Hill that her extended absence would pose an undue hardship, citing among other things to the resignation of an FSW and another being on medical leave.  Walker notified Hill that the agency needed her to return to work about two weeks earlier than originally planned, but that "we will work with you to ensure that you are able to use your earned compensatory leave time."  When Hill failed to return to work as instructed, her employment with ADHS was terminated.

In this lawsuit, Hill alleges discrimination and retaliation in violation of the Rehabilitation Act (against ADHS only) and the Americans with Disabilities Act (against official-capacity defendant Walker only).  Hill also alleges gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended (against ADHS only).

## II. <u>STATEMENT OF FACTS</u>[1]

Plaintiff Yulunda Hill was hired by ADHS on June 28, 2010, as a DCFS Family Service Worker ("FSW") at its Jefferson County office.  *Amended Complaint* (Doc. 19) at ¶ 5; Ex. 1, Hill Dep. at 23.  An FSW is responsible for providing protective foster care and supportive services for abused or neglected children. Ex. 1, Hill Dep. at 19 and Dep. Ex. 2.  The position requires regular contact with clients (i.e., families), as well as the courts, law enforcement officials, and others.  *Id.*

ADHS's Job Description for the FSW position lists, among others, the following "Job Duties and Responsibilities":

- Investigates suspected child abuse and neglect complaints by making on-site visits, securing background information, and interviewing parties involved;

- Intervenes in crisis situations, removes the child from the home if the situation is life threatening;

- Provides counseling and guidance to clients in defining their needs, interests and courses of action;

---

[1] Defendant does not agree that all of the facts set forth by plaintiff are accurate.  It has used many of plaintiff's facts in this statement, however, because even if they are accepted as true summary judgment in favor of defendant still is appropriate.

- [C]onducts home studies and family assessments to determine appropriate child placements, and visits clients and/or foster parents on a regular basis to monitor progress toward case objectives;

- [P]repares court reports for custody hearings and presents testimony when necessary;

- Performs other duties as assigned.

*Id.* Under the "Special Requirement" section, the Job Description provides:

> Frequent twenty-four hour on call duty for response to emergency life and death situations and frequent exposure to physical and verbal abuse is required. Federally mandated service deadlines coupled with heavy case loads and the life and death nature of the work creates a stressful environment.

*Id.* Hill confirmed that the FSW job is a very stressful one with a heavy caseload. Ex. 1, Hill Dep. at 58-59, 60, 86.

On May 24, 2011, Hill sent an email to her immediate supervisor (Christine Thomas), her County supervisor (Carolyn Walker), and her Area Director (Larry Lewis), as well as to the Director of AHDS (John Selig) and others, in which she informed them that "as of today, I'm removing myself from the ["H"] case," which was a child maltreatment case, due to the "hardship" Hill was having with the child's mother. Ex. 1, Hill Dep. at 24-25, 33-34 and Dep. Ex. 3.[2]   Hill reported that the Ms. "H" had used racial slurs

---

[2] Throughout this brief and defendants' exhibits, the names of ADHS clients have been redacted; only initials are used.

against she and her coworkers in open court, had used various obscenities during their contacts, called the Governor's Office to complain about her, and alleged that she had Hill on tape calling her a "bitch" (which Hill denies).  Ex. 1, Hill Dep. at 33-34 and Dep. Ex. 3.

On May 25, 2011, a meeting was held between Hill, Thomas, Walker, and Lewis to discuss the May 24 e-mail and Hill's mandate that she was removing herself from the "H" case.   Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4; Ex. 2, Walker Decl. at ¶ 2.  Walker and Lewis explained that Hill could not unilaterally remove herself from a case.  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 1.  Regarding the difficulties Hill was experiencing in the FSW job, Walker explained:

> this is the nature of this business.  The nature of this business is that we deal with hostile clients all the time.  We have clients who are mad because we have taken their children for whatever reason, they don't want us in their lives and this is something that we deal with quite frequently."

Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 2.  Walker also explained:

> [T]his is the type of behavior that several of our clients do[].  They curse folks out, they call us names.  This is some of the things that we have to deal with on a daily basis. . . this is the type of work that we do.  That is what we are accustomed to.  This is what happens when you are dealing with families.  Because you have people who like I said, they don't want us in their lives, we have their children, they're mad, they don't know how to behave other than the way that they are behaving.  Especially if they are on drugs, that's going to cause them to act in a way that's unprofessional manner.

Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 4.  Lewis likewise explained, "the thing is, when we receive . . . children into custody, [parents] are going to get rude with you and say some horrible things to you."  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 8.

During the meeting, alternatives to removal from the case were explored.  Walker asked whether Hill felt she needed more training in dealing with difficult clients; Hill responded no.  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 2-4.  They discussed the fact that Hill had not yet requested a "special staffing" to address the situation, and agreed that she would request one.  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 5, 8-9.[3]  Lewis and Walker also suggested that when going on a home visit to the "H" residence, Hill would not go alone but rather would take a supervisor or a member of security.  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 5-6, 8-9.  They also discussed that security would be present whenever Ms. "H" was in the office building.  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 8-9.  When Hill continued to resist making a home visit, Walker noted "'we've given you options to try to make this work and then we need to at least try it."  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 10.

_____

[3] A special staffing is a meeting between the FSW, her supervisor, the client(s) and their attorney(s), and an ADHS attorney during which problem issues are discussed.  Ex. 1, Hill Dep. at 44.  The participants decide during the staffing whether they can resolve the issues themselves or whether they needed to refer the matter to the court.  *Id.*

During the meeting, Hill stated that she was on medication for job stress and that she had anxiety attacks.  Ex. 1, Hill Dep. at 38-39 and Dep. Ex. 4, p. 9.  Hill said that she was leaving work due to her stress, and did so after the meeting.  Ex. 1, Hill Dep. at 38-39, 48 and Dep. Ex. 4, p. 9.

The following day, Hill returned to work and presented a doctor's note to her supervisor Thomas.  Ex. 1, Hill Dep. at 48-49, 53 and Dep. Ex. 5.  The note read that Hill was "Under Physician's care on 5-25-11" and was "Released to work/school on 6-20-11."  Ex. 1, Hill. Dep. at 48-49 and Dep. Ex. 5.  The only information provided about her condition was a check mark beside a category reading "illness"; it contained no other information or any date for a follow-up appointment or treatment.  *Id.*  Hill testified that she had only a few sick leave days remaining, so she asked to use accrued compensatory time to cover the remainder.  Ex. 1, Hill Dep. at 29, 49-50.[4]

Hill initially was approved to use her earned compensatory time to cover this period.  Ex. 1, Hill Dep. at 53.  Shortly thereafter, however, a review of the Jefferson County office's caseload revealed that allowing Hill to continue on this extended leave would result in an undue hardship on the

---

[4] Hill also discussed Family and Medical Leave with her supervisor but ADHS subsequently determined Hill to be ineligible because she had not been employed for 12 months.  Ex. 1, Hill Dep. at 50-51, 54 and Dep. Ex. 6. Walker notified Hill of her ineligibility in a letter dated May 31, 2011.  Ex. 1, Hill Dep. at 54 and Dep. Ex. 6.

office.  Ex. 2, Walker Decl. at ¶ 3 and Decl. Ex. B.  In a letter dated May 31 to

Hill, Walker explained:

> I have reviewed your approved compensatory time leave request from May 25, 2011 through June 17, 2011.  I must inform you that your continued leave through June 17 would impose an unreasonable burden on the agency and cannot be granted.  Specifically, as of today Jefferson County has had a Family Service Worker (FSW) resign who was carry a case load of 27 cases that had to be reassigned to other workers.  These cases will be in addition to the 35-39 cases these workers already have, as well as the cases that were recently reassigned from another FSW who has been on sick leave since 4/7/11.[5]  In addition to this, we now have to consider the caseload you are carrying and reassign them to the remaining workers as well as prepare for your June 14, 2011 and possibly June 21, 2011 court dates.  We also have new workers who need seasoned workers to train them how to staff cases to see what services are needed, complete court reports, testify in court, conduct home/provider visits as well as providing services to the foster children/families.  Further, three of the six active workers in Jefferson County recently completed CORE training within the last couple of months.  Of the six workers in Jefferson County, only two are seasoned.  Due to the above, your continued absence during this period of time would disrupt the agency's ability to provide adequate case work services to clients.

Ex. 1, Hill Dep. at 54-55 and Dep. Ex. 7; Ex. 2, Walker Decl. at ¶ 3 and Decl.

Ex. B.  In the letter, Walker notified Hill "[w]e will work with you to ensure

that you are able to use your earned compensatory time," but that allowing

her to be on leave for the entire time requested "would pose an undue

---

[5] The employee who Walker reported as being on "sick leave" was on Family and Medical Leave Act protected leave.  Ex. 2, Walker Decl. at ¶ 3.

hardship on the agency." *Id.* Consequently, Walker instructed Hill to "[p]lease report to work at 8:00 a.m. on June 6, 2011." *Id.*

In a June 6 letter, Hill responded that her doctor had released her from work until June 20 and that she would not return until June 20 "per the advisement of my doctor." Ex. 1, Hill Dep. at 57 and Dep. Ex. 8. Hill wrote, "I ask that you respect I have a family and I must be well enough to care for myself and my family before I can care for the needs of others." *Id.* Hill emailed this letter to Walker on June 7, noting that although she had exhausted all of her sick leave she was using her compensatory time. *Id.* She also admonished Walker for her "inconsideration in mailing certified letters demanding I return to work. . . [which] is very stressful." *Id.* Hill made no other contact with Walker, who was "most definitely" willing to work with Hill so that she could use some of her compensatory time, regarding the possibility of returning to work on a part-time or intermittent basis. Ex. 1, Hill Dep. at 60; Ex. 2, Walker Decl. at ¶ 4.

Hill did not return to work as instructed. Ex. 2, Walker Decl. at ¶ 5. Rather, she stayed and home and slept, read, meditated, spent time with her family, and exercised. Ex. 1, Hill Dep. at 64-65. Due to her failure to return to work as instructed, Walker sent Hill a letter dated June 17 notifying her that her employment was terminated for violation of DHS Policy 1084.3.2, which requires that employees comply with, among other things, reasonable

work-related instructions.   Ex. 2, Walker Decl. at ¶ 5 and Decl. Exs. D and E.
Hill testified that she did not receive the letter via mail, but that she did
receive it when she came to the office on June 20.  Ex. 1, Hill Dep. at 59-60
and Dep. Ex. 10.  Although the letter read that she was not eligible for rehire
with ADHS for two years, this time period later was reduced during the
grievance process.  Ex. 1, Hill Dep. at 26-27.[6]  Still, her termination was
upheld throughout the agency's internal grievance process and at the State
Employee Grievance Appeal Panel.  Ex. 1, Hill Dep. at 78-79.

Hill filed a Complaint in this case on January 13, 2012 (Doc. 2), and an
Amended Complaint on July 31, 2012 (Doc. 19).  This Court dismissed many
of Hill's claims in its Order and Opinion issued on April 26, 2012 (Doc. 11)
and its second Order and Opinion issued on November 9, 2012 (Doc. 24).  The
claims remaining are a Rehabilitation Act claim against ADHS and an
Americans with Disabilities Act claim against Carolyn Walker in her official
capacity only; in both of which Hill alleges unlawful discrimination and

---

[6] Although Hill's Amended Complaint reads that she was "terminated and
designated as never being rehireable . . . a designation that cannot be given
except for a few offenses of the gravest nature," *See Amended Complaint*
(Doc. 19) at ¶ 8, Walker's letter (which Hill admits receiving) expressly
provided that Hill only would "not be eligible for rehire for two years." Ex. 1,
Hill Dep. at 59 and Dep. Ex. 10.  In fact, Hill currently is working for ADHS
at the Arkansas State Hospital as a Rehabilitation Instructor at the same
salary she was earning as an FSW, which ADHS allowed her to carry over
into the new position.  Ex. 1, Hill Dep. at 10.

retaliation. Also remaining is a Title VII gender discrimination claim against ADHS.

### III.  SUMMARY JUDGMENT STANDARD

The United States Supreme Court has found that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catlett,* 477 U.S. 317, 327 (1986). Summary judgment is appropriate when the record taken as a whole shows that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The United States Court of Appeals for the Eighth Circuit has stated that summary judgment motions "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). This same reasoning applies to employment discrimination cases. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011).

To withstand a motion for summary judgment, the nonmoving party has the burden "of presenting evidence sufficiently supporting [any] disputed material facts that a reasonable jury could return a verdict in [his] favor." *Gregory v. City of Rogers, Arkansas,* 974 F.2d 1006, 1010 (8th Cir. 1992)

(*citing Anderson v. Liberty Lobby*, 477 U.S. 424, 248 (1986)).  To meet this burden, the non-movant "may not merely rest upon allegations or denials in [her] pleadings, but must set forth specific facts . . . showing that there is a genuine issue for trial."  *Ghane v. West,* 48 F.3d 979, 981 (8th Cir. 1998) (*citing Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir. 1981)).  Thus, to overcome summary judgment, Hill must offer sufficient probative evidence that would permit a fact finder to rule in her favor based upon more than "mere speculation, conjecture, or fantasy."  *Kneibert v. Thomson Newspapers,* 129 F.3d 444, 455 (8th Cir. 1997).  This Court must enter summary judgment against Hill if she "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial."  *Celotex,* 477 U.S. at 322.

Because Hill has failed to offer evidence sufficient to show discrimination or retaliation under the Rehabilitation Act and ADA, or gender discrimination under Title VII, this Court should dismiss Hill's Amended Complaint in its entirety.

## IV.   ARGUMENT

### A.   Hill Failed To Offer Evidence Sufficient To Establish Discrimination Or Retaliation In Violation Of The Rehabilitation Act Or The Americans With Disabilities Act.

Hill brings claims under both the Rehabilitation Act and the Americans

with Disabilities Act, suing only ADHS under the Rehabilitation Act and suing only official-capacity defendant Walker under the ADA. *Amended Complaint* (Doc. 19) at ¶ 23. "Rehabilitation Act claims and claims under the ADA are evaluated the same; thus, cases dealing with each are interchangeable." *Peebles v. Potter,* 354 F.3d 761, 766 n. 4 (8th Cir. 2004). Because Hill has failed to establish that ADHS discriminated or retaliated against her due to a disability, her claims should be dismissed.

### 1.    *Discrimination*

The ADA prohibits an employer from discriminating against an employee "because of the disability of such individual." *Wood v. Crown Redi-Mix, Inc.,* 339 F.3d 682, 686 (8th Cir. 2003)(*quoting* 42 U.S.C. § 12112(a)). In the absence of direct evidence (as is the case here), these claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Rehrs v. Iams Co.,* 486 F.3d 353, 356 (8th Cir. 2007)(citations omitted). Under this framework, a plaintiff bears of the burden of establishing a *prima facie* case by showing: (1) she had a disability within the meaning of the ADA; (2) she was qualified, with or without reasonable accommodation, to perform the essential job functions of the position in question; and (3) she suffered an adverse employment action because of her disability. *Id.* (citation omitted). The burden then shifts to the employer to articulate some legitimate,

nondiscriminatory reason for the employer's actions.  *Id.* (citation omitted).  If the employer articulates a reason, the burden returns to the employee to show the employer's justification is a pretext.  *Id.* (citation omitted).

For purposes of this Motion only, defendants will assume that Hill had a "disability" as defined by the ADA because she alleges to suffer from depression, stress, and anxiety attacks brought on by her job that affect her ability to think and maintain focus, among other things.  *See e.g., Amended Complaint* at ¶ 6-7; Ex. 1, Hill Dep. at 49 (May 25 meeting with supervisors caused anxiety attack), Hill Dep. at 27-28 (long hours of work and heavy case load caused depression and anxiety; did not have stress and anxiety before working for ADHS).  Hill failed to make a *prima facie* case of disability discrimination, however, because she failed to establish that she was a "qualified" individual with a disability, or that her disability resulted in any adverse employment action taken against her.

To survive summary judgment, Hill first must show that she is a qualified individual under the ADA.  *Otto v. City of Victoria,* 685 F.3d 755, 758 (8th Cir. 2012)(*citing Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135 (8th Cir. 1999)(*en banc*) and 42 U.S. C. § 12111(8)-(9).  An individual is "qualified" for purposes of the ADA if she satisfies the requisite skill, experience, education, and other job-related requirements and "can perform the essential job functions, with or without reasonable accommodation."  *Id.*

14

(*quoting Cravens v. Blue Cross & Blue Shield of Kan. City,* 214 F.3d 1011, 1016 (8th Cir. 2000); *see also* 42 U.S.C. § 12111(8)(same). Essential functions include "the fundamental job duties of the employment position the individual with a disability holds or desires." *Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003)(*quoting* 29 U.S.C. § 1630.2(n)(1)).[7] "An employer's judgment on this question [what is an essential job function] is highly probative." *Id.* (*citing Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 787 (8th Cir. 1998); 29 C.F.R. § 1630.2(n)(1)).

In the present case, Hill sought to remove herself from the "H" case and have ADHS assign it to another FSW as an accommodation for her alleged disability. *Amended Complaint* (Doc. 19) at ¶ 6. Critically, "an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee," nor is an employer "obligated to hire additional employees or reassign existing workers to assist [an employee] in her essential duties." *Fjellestad v. Pizza Hut of American, Inc.,* 188 F.3d 944, 950 (8th Cir. 1999), *reh'g and reh'g en banc denied* (Oct. 13, 1999)(citation

---

[7] Evidence of whether a job function is essential includes, but is not limited to: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; and (7) the current work experience of incumbents in similar jobs. *Rehrs,* 486 F.3d at 356 (citing 29 C.F.R. § 1630.2(n)(3); *Heaser v. Toro Co.,* 247 F.3d 826, 831 (8th Cir. 2001).

omitted); *Alexander,* 321 F.3d at 728.  *See also Moritz*, 147 F.3d at 788 (reassigning tasks to co-workers was not reasonable accommodation under Rehabilitation Act)(*citing with approval Gilbert v. Frank,* 949 F.2d 637, 644 (2nd Cir. 1991)).  Because dealing with difficult clients and situations is an essential function of Hill's FSW job, ADHS was under no obligation to reassign the "H" case from Hill to another FSW.

The job description for the FSW position leaves no doubt as to the FSW's essential job functions, including "regular contact with clients," "provid[ing] counseling and guidance to clients," and "conduct[ing] home studies and family assessments" as part of "proving protective, foster care, and supportive services for abused or neglected children."  Ex. 1, Hill Dep. at 19 and Dep. Ex. 2; Ex. 3, Blucker Decl. at ¶ 3 and Decl. Ex. A.  And the "Special Requirements" section expressly emphasizes the necessity for the FSW to deal with abusive and stressful situations, providing:  *"frequent exposure to physical and verbal abuse is required,"* and "[f]ederally mandated service deadlines coupled with heavy case loads and the life and death nature of the work *creates a stressful environment." Id.* (emphasis added).  This job description leaves no doubt that the FSW must carry a heavy caseload, work within strict deadlines, frequently work overtime, and frequently be exposed to abusive and stressful situations.

And "[a]n employer's judgment" on the question of what constitutes and essential job function "is highly probative." *Alexander,* 321 F.3d at 727 (citations omitted).  Cecile Blucker, who is ADHS's Deputy Director for the Division of Child and Family Services, confirms the accuracy of the job description:  the FSW job is a stressful one and it is imperative that an FSW be capable of handling difficult cases and work within a stressful environment, including being subject to verbal abuse.  Ex. 3, Blucker Decl. at ¶ 4.  This is all a part of fulfilling ADHS's extremely important responsibility to provide protective care and supportive services for abused and neglected children.

The essential nature of handling difficult cases and clients also was reflected in the statements of Walker and Lewis during the May 25 meeting. In summary, they explained to Hill that it was "the nature of the business" for FSWs to frequently have to deal with hostile clients, to be cursed at and have horrible things said about them, to be treated rudely, and to be called names.  And Walker speaks from experience, having been a FSW, FSW Supervisor, or County Supervisor with DCFS for over 15 years.  Ex. 2, Walker Decl. at ¶ 1.

Because dealing with difficult clients and difficult cases is an essential function of the FSW job, ADHS was under no obligation to reassign the "H" case from Hill to another FSW.  Granted, Hill wanted the case reassigned as

17

an "accommodation" and strongly disagreed with ADHS's decision to the contrary.  But a disabled employee is not entitled to an accommodation of her choice, *Rehrs,* 486 F.3d at 359 (*citing Cravens,* 214 F.3d at 1019), only an accommodation that is reasonable.

The facts reflect that ADHS officials made a reasonable, good-faith effort to assist—or "accommodate"—Hill in the performance of her job duties. Initially, Hill made no mention in her May 24 email of any physical or mental impairment; rather, she stated concern for her "professionalism and livelihood."  Ex. 1, Hill Dep. at 33-34 and Dep Ex. 3.  She subsequently volunteered that she was on medication for job stress and that she had anxiety attacks.  Although no one at ADHS considered Hill to have an ADA-covered "disability" (and she has offered no evidence to the contrary), there nonetheless was an "interactive process" that took place during the May 25 meeting with the goal being to assist Hill handle her cases; in particular, the "H" case.

Because Hill was concerned about making an upcoming visit to the "H" home, ADHS officials discussed with Hill she should take a supervisor or member of security with her to the visit.  They also told her that security would be present whenever Ms. "H" was in the building.  They offered Hill additional training in dealing with difficult clients, which she rejected as unneeded.  When they learned that Hill had not held a special staffing to deal

18

with Ms. "H," they discussed and agreed that one would be scheduled. Various possible accommodations were discussed during this problem-solving exchange.

In addition to Hill's failure to prove that she was a "qualified individual" under the second element of the burden shifting analysis, she likewise failed to establish that ADHS's refusal to allow her to remove herself from the "H" case constituted an adverse employment action. Although Hill obviously was unhappy that ADHS would not reassign the case, "[n]ot everything that makes an employee unhappy is an adverse employment action." *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1266 (8th Cir. 1997). Regarding work assignments, "employers have wide latitude to make business decisions. . . [a]n employer has the right to . . . assign work, to change an employee's duties, to refuse to assign a particular job . . . for good reason, bad reason, or no reason at all, absent . . . intentional discrimination." *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 512 (8th Cir. 1995).

Because the ADA did not require ADHS to reassign Hill's difficult case to another caseworker, because ADHS *did* have a dialogue with Hill about what steps could and would be taken to address the problems she was having with the "H" case, and because no adverse employment action resulted from ADHS's refusal to allow Hill to reassign the "H" case, her disability discrimination claim on this point must fail.

Hill also incorrectly alleges that her termination was in violation of the ADA.  Although Hill's extended leave initially was approved, upon a reconsideration of the office's case load, Walker notified Hill that her remaining off work the entire block of time would create an undue hardship. *See Buckles v. First Data Resources, Inc.,* 176 F.3d 1098, 1101 (8th Cir. 1999)(accommodation is unreasonable that imposes undue administrative burdens on employer).  This was due to a work force shortage brought on by, among other things, one FSW's resignation and another being on protected leave under the Family and Medical Leave Act.  Ex. 2, Walker Decl. at ¶ 3.  In her May 31 letter, Walker also left the door open for Hill to continue to take leave using her accrued compensatory time as work load allowed, writing:

> We will work with you to ensure that you are able to use your earned compensatory time, but at this time, for the reasons mentioned in the above paragraph, we cannot allow you to be on leave for the next two and one-half weeks and this would pose an undue hardship on the agency.

Ex. 1, Hill Dep. at 54-55 and Dep. Ex. 7.

When Hill received this letter, she did not take the opportunity to discuss the possibility of part-time work, intermittent work, or to inquire as to how much time off ADHS would be able to give her over the next several weeks.  Ex. 1, Hill Dep. at 60; Ex. 2, Walker Decl. at ¶ 4.  Rather, she responded that she would return to work on June 20 and that she had "a

family and [she] must be well enough to care for [herself] and [her] family before [she could] care for the needs of others." Ex. 1, Hill. Dep. at 57-58 and Dep. Ex. 9.  She then used that time to sleep, read, meditate, exercise, and spend time with her family.  Had Hill reported to work when instructed to do so, she already would have had over eleven calendar days off from work to relax.

Considering the undue burden that her continued time off placed upon the agency, the ADA did not require ADHS to accommodate Hill's disability by affording her additional time off to relax and de-stress based solely on a cryptic doctor note releasing her from work for nearly a month due to "illness."  As the Eighth Circuit explained in *Rask v. Fresenius Medical Care N.A.*:

> The duty to accommodate an employee does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability.  Thus, if an adjustment or modification is job related, e.g., specifically assists the individual in performing the duties of a particular job, it will be considered a type of reasonable accommodation.  On the other hand, if an adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not required to provide.

509 F.3d 466, 471 (8th Cir. 2007)(citation and internal quotations omitted).

ADHS offered job related modifications, which Hill either rejected or ignored.

Moreover, the ADA does not require an accommodation that would cause other employees to work harder or longer.  *Rehrs,* 486 F.3d at 357 (citations omitted).  "The [ADA] does not require affirmative action in favor of individuals with disabilities.  It merely prohibits employment discrimination against qualified individuals with disabilities, no more and no less."  *Id.* (citation omitted).  And the "life and death nature" of Hill's work cannot be ignored in the reasonable accommodation/undue burden analysis.  The FSW position demands not only a regular 40-hour work week but also frequent overtime in order to provide protective care and supportive services for abused and neglected children.  The Eighth Circuit has "consistently held that regular and reliable attendance is a necessary element of most jobs," *Rask,* 509 F.3d at 469 (citation omitted), which undoubtedly would include a job as critical as the FSW's.

Hill also failed to make a *prima facie* case because:  (1) for the reasons discussed above, she failed to establish that she was a "qualified" individual with a disability; and (2) she failed to establish that she was terminated because of any disability.  Rather, she was terminated because she failed to return to work as instructed by her employer, choosing rather to remain at home and relax.  Hill also failed to offer evidence that ADHS's legitimate, nondiscriminatory reason for terminating her employment was pretextual.

22

For the foregoing reasons, Hill's disability discrimination claims must be dismissed.

## 2.    *Retaliation*

Hill's retaliation claim likewise must fail.  ADA retaliation claims also are evaluated under the *McDonnell Douglas* burden shifting framework. *Amir v. St. Louis University,* 184 F.3d 1017, 1025 (8th Cir. 1999)(citations omitted).  A plaintiff must first establish a *prima facie* case of retaliation by showing:  (1) that she engaged in statutorily protected activity, (2) that an adverse employment action was taken against her, and (3) a causal connection between the adverse action and the protected activity.  *Id.* (citations omitted).  If a plaintiff establishing a *prima facie* case, the burden then shifts to the employer to proffer a legitimate nondiscriminatory reason for the adverse action.  *Id.* at 1025-26 (citations omitted).  Once the employer does so, the burden then shifts back to the plaintiff to show that the employer's reason was a pretext for discrimination.  *Id.* at 1026.  The ultimate burden of persuasion rests with the plaintiff at all points throughout the analysis.  *Id.* (citation omitted).

The basis for Hill's ADA retaliation claim is set forth in her Amended Complaint as follows:  [p]laintiff was terminated and designated as never being rehirable in retaliation for identifying herself as a person with a

disability and requesting leave in violation of . . . the ADA and Section 504, a designation that cannot be given except with a few offenses of the gravest nature." *Amended Comp.* at ¶ 8; *see also* ¶ 19 (same).  First, Hill has offered no evidence that she was terminated for identifying herself as disabled or requesting leave.  To the contrary, she was asked to return from previously-approved leave only when ADHS determined that her continued absence would cause an undue burden on an already short-handed workplace.  Had ADHS intended to get rid of Hill because of her alleged disability, Walker would not have instructed her to return to work.  There is absolutely no causal connection.

Nor has Hill offered any evidence that ADHS permanently barred her from employment, and mere allegations set forth in a complaint carry no evidentiary weight in the summary judgment analysis.  *Gibson v. American Greetings Corp.,* 670 F.3d 844, 853 (8th Cir. 2012)(citations omitted).  To the contrary, ADHS's June 17 termination letter to Hill (which she admits receiving) reads:  "[b]ased on this personnel action, you will not be eligible for rehire with the Department of Human Services *for two years*."  (emphasis added).  And although Hill's termination was upheld through the grievance procedure (both internally and at the State Employee Grievance Appeal Panel), even this two-year restriction ultimately was removed.  In fact, Hill

testified that she was hired *by ADHS* at the Arkansas State Hospital in or about October of 2012.   Consequently, this allegation likewise is meritless.

Because Hill failed to establish a *prima facie* retaliation case, and likewise failed to establish that that ADHS's legitimate, non-retaliatory reason for her termination was pretextual, her retaliation claims must be dismissed.

## B.   Hill Failed to Offer Evidence Sufficient To Establish Gender Discrimination.

Hill's gender discrimination claim likewise must fail.  This claim also is evaluated under the *McDonnell Douglas* burden shifting framework.  *Thomas v. Corwin,* 483 F.3d 516, 530 (8th Cir. 2007).  To establish a *prima facie* case of gender discrimination, a plaintiff must show that she:  (1) was a member of a protected class, (2) was qualified to perform her job, (3) suffered an adverse employment action, and (4) was treated differently from similarly-situated male employees.  *Id.* at 529-30.  In support of her gender discrimination claim, Hill alleges in her Amended Complaint that males in her same chain of command who requested leave or accommodation for disabilities were treated more favorably than she "on account of their gender."  *Amended Complaint* (Doc. 19) at ¶ 8, 25.

In *Chappell v. Bilco Co.*, the Eighth Circuit held that the "similarly situated" element of a *prima facie* case requires proof that a plaintiff and her

comparator(s) are "similarly situated in all relevant respects." 675 F.3d 1110, 1118-19 (8th Cir. 2012). "To be similarly situated, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's General Stores,* 638 F.3d 984, 994 (8th Cir. 2011)(internal citation and quotation omitted). Hill has failed to establish that any similarly situated male was treated more favorably than she.

The only male Hill identified is FSW Maurice Anderson. Ex. 1, Hill Dep. at 66-67. The two are not similarly situated. When Anderson took twenty days of leave, Hill and Anderson were not stationed in the same county office: Anderson was stationed in Dallas County and Hill in Jefferson County. Ex. 1, Hill Dep. at 23, Ex. 4, Allen Decl. at ¶ 1, 2. Nor did the two did not have the same supervisor: Anderson's supervisor (who also was the Dallas County Supervisor) was Gary Allen, Hill's supervisor was Christine Thomas and her county supervisor was Carolyn Walker. Ex. 1, Hill Dep. at 24-25; Ex. 4, Allen Decl. at ¶ 2. Also, contrary to Hill's unsupported allegations, Anderson did not request an accommodation for any disability; rather, he requested time off to attend to the needs of family members. Ex. 4, Allen Decl. at ¶ 2. Also, contrary to the labor force shortage the Jefferson County office was experiencing at the time Walker instructed Hill to return

26

to work, at the time Anderson requested and was granted twenty days of leave, Dallas County was not suffering a similar shortage.  Ex. 4, Allen Decl. at ¶ 2.

Due to these many dissimilarities, ADHS's affording Mr. Anderson leave offers no support for Hill's gender discrimination claim.  Hill failed to make a *prima facie* case because, as discussed above, she was not a "qualified individual" for the FSW position, and ADHS's not reassigning the "H" case from  Hill to another FSW did not constitute an adverse employment action. In any event, because Hill failed to establish that ADHS's legitimate, non-discriminatory reason for any action taken against her was pretextual, her gender discrimination claim must be dismissed.

## V.  **CONCLUSION**

For the foregoing reasons, the defendants respectfully request that this Court dismiss plaintiff's Amended Complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(c), and for all other relief that is just and proper.

Respectfully submitted,

DUSTIN McDaniel
Attorney General

By:   /s/ Lori Freno, Sr. Asst. Attorney General
Arkansas Bar Number 97042
Arkansas Attorney General's Office

27

323 Center Street, Suite 200
Little Rock, AR  72201
(501) 682-1314
E-mail:  lori.freno@arkansasag.gov

Attorneys for defendants

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2012, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which shall

send notification of such filing to the following:

Mr. Luther Oneal Sutter
luthersutter.law@gmail.com
james.scurlock@gmail.com
SGlaw.ECF@gmail.com

There are no persons to be notified manually.

/s/  Lori Freno