**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

YULANDA HILL                                                                            PLAINTIFF

v.                                           NO. 5:12CV00016 JLH

CAROLYN WALKER, individually and in her
official capacity as an employee of the
ARKANSAS DEPARTMENT OF HUMAN SERVICES                            DEFENDANTS

## OPINION AND ORDER

      Yulanda Hill brings this action against the Arkansas Department of Human Services (DHS)

and Carolyn Walker, Hill's former supervisor with DHS.  Hill alleges numerous claims surrounding

her termination by DHS and Walker.  Previously, the Court dismissed all of Hill's claims except for

her sex discrimination claim and her claims under the Americans with Disabilities Act and the

Rehabilitation Act.  The defendants have now moved for summary judgment on these remaining

claims, while Hill has filed a motion to either strike certain testimony relied upon by the defendants

or stay the proceedings in anticipation of further discovery.  For the following reasons, the Court

grants the motion for summary judgment and denies the motion to strike or stay.

## I.

      On June 28, 2010, Hill was hired by DHS as a Family Service Worker for the Jefferson

County, Arkansas, area.  A Family Service Worker, according to the "Functional Job Description,"

is "responsible for providing protective, foster care, and supportive services for abused or neglected

children" and must maintain regular contact with such children and their families.  Document #26-1,

at 37.  The functional job description lists, among other things, the following as duties and

responsibilities of a Family Service Worker:

1

> Investigates suspected child abuse and neglect complaints by making on-site visits . . . and interviewing parties involved. . . . [Intervenes] in crisis situations, removes the child from the home if the situation is life threatening, and arranges for temporary placement in foster homes, group homes, or treatment facilities. . . . Provides counseling and guidance to clients in defining their needs, interests, and courses of action and refers clients to other professionals, agencies, services, or community resources appropriate to clients' problems. Recruits and trains families, conducts home studies and family assessments to determine appropriate child placements, and visits clients . . . on a regular basis to monitor progress toward case objectives.

*Id.* The functional job description also lists these "Special Requirement[s]" for the position:

> Frequent twenty-four hour on call duty for response to [emergency] life and death situations and frequent exposure to physical and verbal abuse is required.

> Federally mandated service deadlines coupled with heavy case loads and the life and death nature of the work creates a stressful environment.

*Id.* at 38. In deposition, Hill testified that her job, in practice, was very stressful and involved a heavy caseload. Similarly, Cecile Blucker, a DHS Deputy Director, stated in a declaration that a Family Service Worker must be able to work long hours and handle difficult cases in a stressful environment with frequent exposure to physical and verbal abuse. *See* Document #26-3, at 1-2.

Hill's immediate supervisor for her job was Christine Thomas and her County Supervisor was Walker. On May 24, 2011, Hill sent an e-mail to various DHS personnel, including Thomas and Walker, stating that she was removing herself from a specific child maltreatment case due to extreme difficulties she was having with the child's mother. In the e-mail, Hill wrote that the mother had used racial slurs and other obscenities against Hill and her coworkers, had called the Governor's office to complain about Hill, and had alleged, through her attorney, that there was a recording of Hill cursing at her.

The day after Hill sent the e-mail, she met with Thomas, Walker, and DHS Area Director

Larry Lewis to discuss the situation.  At the meeting,[1] Hill gave more details about her altercations with the mother in question and reiterated that she desired to be removed from the case.  Walker and Lewis, however, told Hill that she could not unilaterally remove herself from a case.  Regarding Hill's specific case difficulties, Walker stated that:

> The nature of this business is that we deal with hostile clients all the time.  We have clients who are mad because we have taken their children for whatever reason, they don't want us in their lives . . . . [Our clients] curse folks out, they call us names. This is some of the things that we have to deal with on a daily basis almost, so removing yourself is not the answer. . . . Especially if [the clients] are on drugs, that's going to cause them to act in a way that's unprofessional[.]

Document #26-1, at 43, 45.  Lewis echoed these sentiments, explaining that parents whose children have been taken away "are going to get rude with you and say some horrible things to you . . . but we can't always pull you off the case."  *Id.* at 49.

During the meeting, Walker and Lewis brought up several possible solutions to Hill's quagmire that would not involve her removal from the case.  First, they suggested additional training concerning difficult clients.  Second, they noted that Hill had not requested a "special staffing," which is a meeting between a caseworker, her supervisor, the client, and all attorneys involved, during which it is decided whether problems can be resolved or whether a court referral is necessary. Third, they proposed that Hill take a supervisor or security person with her during visits to the mother's home.  Fourth, they offered to have security present whenever the mother was in the DHS office building.  Hill eventually agreed that she would thereafter request a special staffing, although she denied needing additional training and continued to resist the idea of her involvement in any future visits for that specific case.  In response, Walker stated, "We've given you options to try to

---

[1] The meeting was transcribed, a copy of which exists in the record.  *See* Document #26-1, at 41-55.  Neither party contests the accuracy of the transcript.

make this work and then we need to at least try it."  *Id.* at 51.

Over halfway through the meeting, in the middle of discussions about the aforementioned solutions, Hill stated that she was on medication for stress and that she had been experiencing anxiety attacks—all related to "this job," and more specifically, the mother.  Hill indicated that because of this stress she was going to leave work that day to consult a counselor regarding medication.  Walker responded that DHS did not have anything in writing related to Hill's medication or medical leave requests.  After the meeting, Hill left work.  In deposition, she testified that the meeting itself caused her to have an anxiety attack.  The next day, on May 26, 2011, Hill returned to work and gave Thomas a doctor's note stating that Hill was under her physician's care as of May 25 and that she would be released to work on June 20.  The only information provided about Hill's actual condition was a checkmark next to the printed word "illness."  *See id.* at 57.  Hill had few sick leave days remaining at that time, so she asked to use FMLA or accrued compensatory time to cover her being gone until June 20.  While she was not deemed eligible for FMLA, Hill was approved to use her earned compensatory time from May 25 until June 20.

The decision to grant Hill compensatory leave for nearly a month was subsequently reversed, however.  In a May 31 letter to Hill, Walker wrote that she had "reviewed [Hill's] approved compensatory time leave request" and determined that her "continued leave through June 17th would impose an unreasonable burden on the agency and cannot be granted."  *Id.* at 61.[2]  In the letter, Walker explained that Hill's absence "would disrupt the agency's ability to provide adequate case work services to clients" and "pose an undue hardship on the agency" for a number of reasons.

---

[2] To be clear, the evidence shows that the defendants initially granted Hill leave *through* June 17, which was a Friday, and expected her to return back to work *on* June 20, which was a Monday. This distinction helps explain the variance in dates given by various persons involved.

*Id.* Walker instructed Hill to report back to work on the morning of June 6, 2011. This meant that Hill would receive a little over one week of leave, as opposed to the three-plus weeks that had previously been approved.

Hill responded with a letter of her own a week later.[3] Among other things, Hill wrote that:

I will return to work on Monday, June 20, 2011 per the advisement of my doctor. I have Comp time as well as annual leave. I've completed my leave slips as well as my time sheets and I turned all documents in to Mrs. Thomas. Upon returning to work, I will have remaining annual leave and comp time.

I ask that you respect my time off for medical leave and allow me to have a full recovery before returning to work. I ask that you respect I have a family and I must be well enough to care for myself and my family before I can care for the needs of others.

I know of four other employees that work and have worked for the Agency and no one harassed them while they were on medical leave. Mrs. Walker, as a professional and as County Supervisor, I ask that you give me the same respect. Mrs. Walker, it's very unprofessional and unethical of you to send me certified letters demanding I return to work while I'm on medical leave and against my doctor's orders.

Therefore, I anticipate the receipt of my doctor's excuse, leave slips and time sheets suffice according to policy. I don't anticipate any more certified letters demanding I return to work before being released from my doctor. I also don't anticipate any disruptions in my pay as I've turned in all needed documents to maintain my pay as I'm on medical leave.

Any and all concerns may be addressed upon my return to work on Monday, June 20, 2011 per my doctor's orders.

*Id.* at 63.

Hill did not return to work on June 6. Instead, she stayed home and slept, read, meditated, spent time with her family, and exercised. Walker thereafter sent Hill a letter, dated June 17, stating that she was being terminated for violating DHS Policy 1084.3.2, which requires, among other

---

[3] The letter is dated June 6, 2011, but was e-mailed to Walker on June 7.

things, employees to comply with "all reasonable work-related instructions."  Document #26-2, at

8-9.  The letter also stated that Hill was not eligible for rehire with DHS for two years.  Hill did not

receive the letter in the mail; rather, she was given it when she reported to work on June 20.

Document #26-1, at 26-27.

The next day, on June 21, 2011, Hill filed an internal grievance protesting the termination

decision.  A fact-finding conference was conducted on August 16 by grievance officer Marie

Lawrence.  At the conference, Walker testified twice that she had "based the termination on Ms.

Hill's not showing up for work on June 6, 2011."  Document #36-1, at 5.  After the conference,

Lawrence issued a written opinion with the following findings:

> [Walker's] contention that the grievant failed to return to work when requested is
> supported by the facts.  There is no argument that Ms. Hill may have been stressed,
> but the doctor's note was vague.  Ms. Hill had no sick leave and asked for comp time
> in lieu of sick leave.  Comp time is approved with the consideration of the needs of
> the Agency.  At the time of the initial request, it was believed that approval of this
> much comp time leave could be handled.  In looking further, it was determined that
> it would be burdensome on the Agency and that it could not be approved for that
> long.  The agency had the authority to deny the comp time leave.  Ms. Hill was
> requested to return to work but did not respond until after she did not return to work.
> Ms. Hill did not consult with her doctor or her supervisor to see if there were
> accommodations which could be made.

*Id.* at 6.  Lawrence then gave her final decision:

> Based on these findings, the recommendation is that Ms. Hill's termination stand.
> The evidence substantiates the division's disciplinary action against the grievant and
> shows that this termination is an appropriate response to the grievant's actions.  The
> termination is due to medical reasons and Ms. Hill's inability to return to work.
> Therefore, termination without prejudice will allow Ms. Hill to apply for any
> position within DHS with a doctor's full release.

*Id.* at 7.  Hill subsequently appealed Lawrence's decision to the State Employee Grievance Appeal

Panel.  This appeal was denied.

Hill filed her initial complaint in this Court on January 13, 2012, alleging that the

defendants' actions violated the Fair Labor Standards Act, the ADA, the Rehabilitation Act, the FMLA, and Hill's due process rights.  On April 26, 2012, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court dismissed without prejudice all of Hill's claims except those brought under the ADA and Rehabilitation Act.  On July 31, 2012, the Court permitted Hill to file an amended complaint in which she added a claim for sex discrimination.  On October 9, 2012, the Court issued another order confirming that all of Hill's claims that had been dismissed under the original complaint should again be dismissed because Hill had not added sufficient allegations to sustain them.[4]  On November 27, 2012, Walker filed a motion for summary judgment on Hill's remaining claims, which now consist of her ADA claim against Walker in her official capacity, her Rehabilitation Act claim against DHS, and her sex discrimination claim against both defendants.  Hill then simultaneously filed a response opposing the summary judgment motion and a motion asking the Court to strike certain testimony or stay the case until she could take certain depositions.

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine

---

[4] The Court also expounded upon its rationale for dismissing Hill's FMLA claims.  *See* Document #24.

dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

## III.

Hill has now abandoned her sex discrimination claim under Title VII.[5] Thus, the Court must analyze only her Rehabilitation Act and ADA claims. Hill brings two claims under the Rehabilitation Act and the ADA—a failure-to-accommodate claim and a retaliation claim.[6] The Court will analyze these claims in turn.

_____

[5] Specifically, Hill states that *Twiggs v. Selig*, 679 F.3d 990 (8th Cir. 2012), "is controlling precedent" and thus "this Court unfortunately is bound to dismiss the [sex discrimination] claim." Document #34, at 4. She does not state, however, why *Twiggs* controls her case nor why the Court is so bound. In addition, the defendants do not mention *Twiggs* in their motion for summary judgment. Regardless, the Court takes this language for what it plainly is—a concession and abandonment.

[6] Hill asserts in her summary judgment response that "she was terminated because of her inability to work . . . ." Document #34, at 2. The defendants seemingly read this language as asserting an intentional discrimination claim, and respond accordingly. Intentional discrimination is a separate form of discrimination under the ADA, distinct from a failure to accommodate. *See Peebles v. Potter*, 354 F.3d 761, 765-66 (8th Cir. 2004). Given the context of the assertion and the fact that Hill never mentions such a claim in her complaint, the Court believes it best to construe this language as simply restating (or perhaps misstating) Hill's ADA retaliation or failure-to-accommodate claim.

**A. Failure to Accommodate**

Hill argues that the defendants violated the ADA and Rehabilitation Act by failing to accommodate her disability. To survive summary judgment on this claim, Hill must first make a facial showing that she has an ADA disability and that she suffered an adverse employment action. *Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (citing *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)).[7] Hill must then make a facial showing that she is a "qualified individual" under the ADA. *Id.* (citing *Fenney*, 327 F.3d at 712).

The defendants do not dispute, for summary judgment purposes, that Hill was disabled within the meaning of the ADA. More specifically, the defendants do not dispute that Hill's depression, stress, and anxiety attacks substantially limited one or more of her major life activities, including thinking and concentrating. *See* 42 U.S.C. § 12102(1)(A) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities"); 29 C.F.R. § 1630.2(i)(1)(i) (listing thinking and concentrating as major life activities). It is similarly undisputed that Hill was terminated, which undeniably constitutes an adverse employment action. *See Dropinski v. Douglas Cnty.*, 298 F.3d 704, 707 (8th Cir. 2002). The parties do, however, dispute whether Hill was a qualified individual under the ADA.

*1. ADA Qualified Individual*

To be a qualified individual under the ADA, Hill must first show that she possesses "the requisite skill, education, experience, and training for [her] position." *Brannon*, 521 F.3d at 848 (citation omitted). The Court will assume for purposes of this opinion that Hill has met this burden.

---

[7] Eighth Circuit cases interpreting the ADA and the Rehabilitation Act "are interchangeable," as the Eighth Circuit applies the same analysis to both claims. *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.

Next, Hill must demonstrate that she could actually perform the essential job functions of a Family Service Worker, with or without a reasonable accommodation. *Id.*; 42 U.S.C. § 12111(8)). Hill does not contend that she could perform her job's essential functions without a reasonable accommodation. She must therefore make a facial demonstration that a reasonable accommodation was possible. *Brannon*, 521 F.3d at 848; *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). Hill proposes several accommodations to fit this bill.

First, Hill alleges in her complaint that it would have been reasonable to allow her to be removed from the contentious case because it was giving her extreme anxiety and stress. The defendants counter by arguing that removing Hill from the case in question is not reasonable because it would involve eliminating an essential function of Hill's job—handling of abusive clients and stressful cases. As it has long been "well settled that an employer is under no obligation to reallocate the essential functions of a position," *Alexander v. The Northland Inn*, 321 F.3d 723, 728 (8th Cir. 2003) (citation omitted), the Court must determine whether handling abusive clients and stressful cases was an essential function of Hill's job.

The defendants bear the burden of showing that a particular job function is essential. *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007).[8] "Essential functions of a position are the fundamental duties of the job, but not its marginal functions." *Kallail*, 691 F.3d at 930; *see also* 29 C.F.R. § 1630.2(n)(1). Determining whether a job function is essential is a highly fact-intensive inquiry in which the Court must consider, among other things:

> (1) the employer's judgment as to which functions are essential; (2) written job

---

[8] Employers bear this burden because "much of the information which determines those essential functions lies uniquely with [them]." *Kallail v. Alliant Energy Corp. Servs.*, 691 F.3d 925, 930 (quoting *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995)).

descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the [employee] to perform the function.

*Rehrs*, 486 F.3d at 356 (citing 29 C.F.R. § 1630.2(n)(3)).

The record contains numerous examples of the judgment of DHS about the essential nature of this function, mostly in the form of statements made by Walker, Lewis, and Blucker. These DHS representatives all emphasized, in a variety of ways, that dealing with hostile and abusive clients was "the nature of the business" for a Family Service Worker. *See, e.g.,* Document #26-1, at 42-55; Document #26-3. Hill's functional job description states that "frequent exposure to physical and verbal abuse" is a special requirement and that "deadlines coupled with heavy case loads and the life and death nature of the work creates a stressful environment." Document #26-1, at 38. Concerning the amount of time spent on the function, Walker stated at the May 25 meeting that dealing with hostile and abusive clients is something that has to be done on "a daily basis almost." *Id.* at 45. Moreover, the aforementioned job description states that Family Service Workers face "[f]requent twenty-four hour on call duty for response to [emergency] life and death situations." *Id.* at 38. Finally, for evidence of the consequences of not requiring Hill to perform the function, Walker indicated in the May 25 meeting that removing Hill from a stressful case because a client was hostile and abusive would create an unworkable precedent considering many other clients were also hostile and abusive. *Id.* at 43-46.

Hill does not dispute any of this evidence. Indeed, she appears to abandon this proposed accommodation entirely in her brief. The defendants have convincingly demonstrated that handling stressful cases involving hostile and abusive persons is an essential function of the Family Service Worker position, and no reasonable juror could conclude otherwise. *See Teske v. CCA of Tenn.,*

*LLC*, No. 1:11-CV-00412, 2012 WL 4020947, at *2 (S.D. Ind. Sept. 12, 2012) (essential function of correctional officer's job was being "capable of enduring verbal and mental abuse from inmates"). The defendants were therefore not obligated to remove Hill from a stressful case involving an abusive and hostile person.  Summary judgment will be granted on this proposed accommodation.

Hill focuses her brief on the argument it would have been a reasonable accommodation to permit her to take the full compensatory leave she was originally granted.  While "regular attendance at work is an essential function of employment," permitting an employee to take "a medical leave of absence might, in some circumstances, be a reasonable accommodation."  *Brannon*, 521 F.3d at 849 (citing *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 n.3 (8th Cir. 1999)); *see also* 29 C.F.R. § 1630.2(o)(2)(ii) (reasonable accommodation may include "part-time or modified work schedules").  A number of courts have "concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 186 n.6 (2d Cir. 2006) (collecting cases); *see also Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009) ("[A] request for an indefinite leave of absence . . . is not a reasonable accommodation under the ADA.").  Hill's request for leave was inarguably finite—a mere two extra weeks.  Furthermore, the record indicates not only that the two weeks of leave was "reasonably likely to enable [Hill] to return to work," but also that Hill actually returned to work after the two weeks was over, only to find she had been terminated. Thus, it would appear that Hill has made a facial demonstration that a reasonable accommodation—in the form of two extra weeks of leave—was possible.

With Hill having demonstrated that a reasonable accommodation was possible, the burden of production shifts to the defendants to show that they are unable to accommodate Hill.  *Fenney*,

327 F.3d at 712 (quoting *Benson*, 62 F.3d at 1112).  One way of doing this is to show that Hill could

not "perform the essential functions of the job even with a reasonable accommodation."  *Id.*; *see also*

*Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 778 (8th Cir. 2001) (rejecting an ADA claim where

employee previously alleged a complete inability to work).  To meet their burden, the defendants

point out that it is undisputed that, before she left, Hill continued to resist working on the difficult

case, and that Hill herself testified that she would have been unwilling to handle the case when she

returned on June 20.  The defendants are correct.  In deposition, Hill stated as follows:

> [Attorney:] And when you were terminated, would you have been willing to continue
> to work on that bad case?
>
> [Hill:] No, I would have wanted to be accommodated by being removed from that
> case, but I would have been willing to work still to maintain my job.

Document #41-1, at 18.  Thus, while Hill professed a willingness to return to work in general, she

also firmly reiterated her belief that she should be excused from working with a hostile client.  This

demonstrates that Hill could not—or would not—perform what is undisputedly an essential function

of a Family Service Worker.  The defendants have met their burden of production.

With the defendants having met this burden, the burden again shifts.  Hill must now rebut

the defendants' showing with evidence of her individual capability to perform her job's essential

functions.  *Fenney*, 327 F.3d at 712 (quoting *Benson*, 62 F.3d at 1112).  Hill has not provided any

evidence to meet this burden.  Instead, as noted above, she has failed to dispute facts and provided

testimony that cut against her position.  Therefore the defendants are entitled to summary judgment

on Hill's reasonable accommodation claim.  *See Brannon*, 521 F.3d at 848-49 (summary judgment

proper where employee failed to show that accommodation would permit her to regularly attend

work—an essential function of her job); *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471

(8th Cir. 2007) (similar).

In her response brief, Hill mentions one more possible accommodation. Specifically, she argues that the defendants could have reasonably accommodated her by allowing her to take leave without pay or catastrophic leave under DHS policy regulations. *See* Document #36-2, at 7-10. This accommodation was not reasonable, however, for the same reason that the previous accommodation was not reasonable. Hill was unwilling to perform an essential function of her position, thus she cannot prevail on a failure-to-accommodate claim. Summary judgment will be granted.

*2. Interactive Process*

As part of her failure-to-accommodate claim, Hill also argues that the defendants gave "absolutely no thought" to engaging in the required good faith interactive process concerning potential accommodations. While an employer's failure to engage in an interactive process does not equal per se ADA liability in the Eighth Circuit, such a failure does preclude the granting of summary judgment. *See Fjellestad*, 188 F.3d at 952. In order to demonstrate that the defendants failed to engage in an interactive process, Hill must show that: (1) the defendants knew about her disability; (2) she requested an accommodation or assistance for her disability; (3) the defendants did not make a good faith effort to assist her in seeking this accommodation; and (4) Hill could have been reasonably accommodated but for the defendants' lack of good faith. *Id.* (citing what is now *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999)).

Hill cannot meet the fourth prong because, as detailed above, she refused to perform an essential function of her job—working with hostile clients. Again, summary judgment is in order.

*3. "Per Se" ADA violation*

Finally, Hill argues that the defendants required her to obtain a "full release" before she

could return to work, and that this is a per se violation of the ADA's requirement that employers engage in an interactive process with individual employees to investigate reasonable accommodations.[9]  For evidence, Hill points to Lawrence's post-termination grievance opinion, which stated that "termination without prejudice will allow Ms. Hill to apply for any position within DHS *with a doctor's full release*."  Document #36-1, at 7 (emphasis added).

It does appear to be true that a "must be cured" or "100% healed" policy is a per se ADA violation.  *See, e.g., McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999). This is because such a policy typically does not allow a case-by-case assessment of an employee's ability to perform essential functions of the job, with or without accommodation.  *Heise v. Genuine Parts Co.*, 900 F.Supp. 1137, 1154 n.10 (D. Minn. 1995); *Hutchinson v. United Parcel Serv., Inc.*, 883 F.Supp. 379, 397 (N.D. Iowa 1995).

As the defendants correctly point out, however, the phrase in question was written by a person not involved in the decision to terminate Hill.  Moreover, the phrase was not referring to any requirement given by the defendants to Hill pre-termination.  Rather, it concerned Hill's post-termination standing with DHS, which is not in dispute here other than for Hill's retaliation claim. Furthermore, there is no evidence in the record that the defendants required any type of full release from Hill before she would be allowed to return to work.  On the contrary, the defendants actually requested that she return to work earlier than expected even though she had informed them of her

---

[9] In her brief, Hill lists this as an entirely separate claim under the ADA, but her arguments themselves indicate that it is just a subset of her failure-to-accommodate claim.  This reading is more in line with her complaint, which only mentions the failure-to-accommodate and retaliation claims.

disability.[10]   Summary judgment will be granted on this argument.

**B. Retaliation**

Hill next contends that Walker fired her and designated her as non-rehirable in retaliation for Hill identifying herself as a person with a disability and requesting leave as an accommodation. While Hill presents this as essentially one claim, it is probably more accurate to view it as at least two separate claims: (1) that the defendants fired Hill in retaliation for engaging in ADA-protected activity; and (2) that the defendants designated Hill as non-rehirable in retaliation for engaging in ADA-protected activity.

"The ADA prohibits discrimination against any individual who has opposed an unlawful act of discrimination, made a charge of discrimination, or participated in any manner in an investigation or proceeding under the ADA." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006). ADA retaliation claims are analyzed under the familiar *McDonnell Douglas* framework.  To avoid summary judgment, Hill must first make out a prima facie case by showing that: (1) she engaged in statutorily protected activity; (2) the defendants took an adverse employment action against her; and (3) the adverse employment action and the protected activity were causally connected.  *Id.* (citing *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999)).

*1. Prima Facie Case*

For either of Hill's retaliation claims, there can be little dispute that Hill engaged in statutorily protected activity by identifying herself as a person with a disability and requesting leave.  *See* 42 U.S.C. § 12203(a); *DuBerry v. D.C.*, 582 F.Supp.2d 27, 37 (D.D.C. 2008) ("Requests for

---

[10] Notably, there is no evidence in the record that DHS actually required a full release for Hill to being working in her current position, either. Hill presently works as a DHS Rehabilitation Instructor at the Arkansas State Hospital.

16

accommodation are 'protected activities' within the meaning of the ADA."). Similarly, the defendants do not dispute that Hill's termination constitutes an adverse employment action for ADA retaliation purposes.

The defendants do contend, however, that Hill's designation as non-rehirable for two years does not constitute an adverse employment action because it was removed in the post-termination grievance process, which allowed Hill to rehire with DHS at a different venue. This is essentially a mootness argument, and it is incorrect. *See Reese v. Owens-Corning Fiberglas Corp.*, 31 F.Supp.2d 908, 914-15 (D.Kan. 1998) (rejecting argument that plaintiff's loss-of-seniority claim was rendered moot where plaintiff's seniority was later restored through the grievance process); *Phillips v. Collings,* 256 F.3d 843, 849 (8th Cir. 2001) (employer's corrective action plan was still an adverse employment action even though rendered moot by employee's transfer); *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71-72, 126 S. Ct. 2405, 2417, 165 L. Ed. 2d 345 (2006) (thirty-seven day suspension without pay was an adverse employment action even though employer eventually reinstated employee with backpay). Had it not been rescinded, the designation of Hill as non-rehirable would have constituted an adverse employment action. *See Buboltz*, 523 F.3d at 868 ("[C]hanges that affect an employee's future career prospects are significant enough to meet [adverse employment action] standard."). Since the retraction has been shown to be of no consequence, Hill has met her burden on the second prong in regards to her non-rehirable designation claim.

As to the third prong, the defendants argue that Hill has not causally connected the adverse actions and her statutorily protected activity. Hill contend that the narrow amount of time—less than a month—between the adverse actions and her statutorily protected activity demonstrate a causal

connection.  In detailing what amount of time, by itself, between a protected activity and an adverse employment action is sufficient to maintain a claim in the retaliation context, the Eighth Circuit concluded that two months cannot justify a finding of causation, whereas a "matter of weeks" can. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (finding that a two-week period was "barely" sufficient to establish causation and complete a prima facie case).  Thus, even by itself, the time differential arguably makes Hill's prima facie case.

Hill has not relied entirely upon timing, however.  Hill also points out that Lawrence, the deciding official in Hill's post-termination grievance process, wrote in her decision that Hill's termination was "due to medical reasons and Ms. Hill's inability to return to work."  Document #36-1, at 7.  While the defendants are correct that Lawrence was not involved in Hill's actual termination decision, the fact remains that Lawrence conducted a "fact-finding conference" at which both Walker and Thomas testified, and she issued a six-page opinion detailing her conclusions and decision based off the information gleaned at this conference and elsewhere.  Certainly, this evidence is not direct, but it does go hand-in-hand with the timing differential to make a prima facie case as to whether Hill's disability-related actions were connected to her employer's adverse actions.

The defendants respond in part by arguing that there cannot be a causal connection because, after Hill's identification and request, she was actually asked to return to work early.  This, they contend, demonstrates that the defendants wanted Hill to work rather than be terminated because of her disability-related activity.  While this may be true, arguments such as this are not sufficient to dispel the fact-issue created by Hill's evidence.  *See Smith*, 302 F.3d at 833 (*McDonnell Douglas* "requires only a minimal showing before requiring the employer to explain its actions.").

*2. Legitimate, Non-Discriminatory Reason*

Because Hill has established a prima facie case of retaliation, the burden now shifts to the defendants to articulate a legitimate, non-discriminatory reason for the adverse action.  *Mershon*, 442 F.3d at 1074 (citing *Amir*, 184 F.3d at 1025-26).  The defendants argue that Hill was terminated because she failed to return to work as required, choosing to remain at home for two weeks instead. For evidence, they provide the affidavit of Walker, who states that DHS terminated Hill's employment because she "did not return to work as instructed."  Document #26-2, at 2.  They also provide the actual letter from Walker to Hill stating the reasons for her termination.  Document #26-2, at 8.  In the letter, Walker tells Hill she is terminated and states that "the reason for termination is violation of DHS Policy 1084.3.2."  *Id.*  Finally, the defendants provide a copy of DHS Policy 1084.3.2, which states, in part, as follows:

> Compliance–Employees must comply with workplace policies, rules and all job-related standards, standard practices, and requirements, including, without limitation, laws . . . , rules, regulations, judicial and administrative decisions, agency interpretations, and all reasonable work-related instructions.

*Id.* at 9.

This is sufficient to establish a legitimate, non-discriminatory reason, as the Eighth Circuit has "repeatedly held that insubordination and violation of company policy are legitimate reasons for termination."  *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 796 (8th Cir. 2011) (citation omitted).[11]

*5. Pretext*

The burden now shifts back to Hill to demonstrate that the defendants' reason was a pretext for discrimination.  *Mershon*, 442 F.3d at 1074 (citing *Amir*, 184 F.3d at 1026).  To do so, Hill must

---

[11] Hill's only counter is to argue that there is no evidence that she was terminated for violating the attendance policy.  This is plainly incorrect.

establish that the defendants' proffered explanation is unworthy of credence, or at least create a factual dispute on that point, and she must also "offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010); *Mershon*, 442 F.3d at 1075 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)).

Hill's argument for pretext relies largely on Lawrence's post-termination grievance opinion. As noted above, the language from Lawrence's opinion is not insignificant, and it contributes, along with the timing differential, to make Hill's prima facie retaliation case. But while an especially strong prima facie case can at times also demonstrate pretext, that is not the case here. Here, reliance on Lawrence's statement for pretext is especially weakened by the fact that the rest of Lawrence's opinion actually supports the defendants' legitimate non-discriminatory reason. For starters, Lawrence wrote that Walker twice testified that Hill was terminated because she refused to report back to work. Lawrence also stated, in her findings section, that Walker's "contention that the grievant failed to return to work is supported by the facts," that the "agency had the authority to deny the comp time leave," and that "Hill was requested to return to work but did not respond." Finally, Lawrence wrote in her decision that the "evidence substantiates the division's disciplinary action against the grievant and shows that this termination is an appropriate response to the grievant's actions." Thus, even though Lawrence also wrote that Hill's termination was "due to medical reasons and Ms. Hill's inability to return to work," the evidence she actually provides and the findings and decision she makes based on this evidence support the defendants' legitimate, non-discriminatory reason. Given these circumstances, pretext cannot be found.

Furthermore, it is undisputed that Hill was instructed to return to work and she refused.

Instead, she responded with a letter that described Walker as "unprofessional," "unethical," and a "harass[er]."  *See* Document #26-1, at 63.  On these facts, no reasonable jury could find that the reasons stated by the defendants for their decision to terminate Hill were pretext for unlawful retaliation.  *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("None of the evidence Kasper presented sufficiently demonstrates retaliatory intent to establish Federated's proffered reason for discharging Kasper is pretext. We will not second guess an employer's decision to discharge an employee who refuses to perform the essential functions of the employee's job.").  Hill's additional protestation that the defendants' action was suspect because it was nonsensical is likewise meritless, as the Eighth Circuit has "said many times, we do not sit as a 'super-personnel department' with the power to second-guess employers' business decisions."  *Russell v. TG Mo. Corp.*, 340 F.3d 735 (8th Cir. 2003).  Summary judgment will be granted.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion for summary judgment.  Document #26.  Hill's motion to strike or stay is denied.  Document #32.[12]

IT IS SO ORDERED this 18th day of January, 2013.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[12] In this motion, Hill contends that the defendants failed to disclose certain things in the discovery process, which led to her not being able to argue undue hardship as well as she would have liked.  Document #33, at 2.  As the Court does not reach the issue of undue hardship, it is unnecessary to consider whether to stay a decision so Hill could gather more evidence or whether to strike the defendants' evidence on this issue.